UNITED  STATES  DISTRICT  COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CYNTHIA ROCHA, | ) | 1:07-cv-00836-SMS |
| | ) | |
| Plaintiff, | ) | DECISION AND ORDER ON SOCIAL |
| v. | ) | SECURITY COMPLAINT (DOC. 1) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | ORDER DIRECTING REMAND PURSUANT |
| COMMISSIONER OF SOCIAL | ) | TO SENTENCE FOUR of 42 U.S.C. § |
| SECURITY, | ) | 405(g) |
| | ) | |
| Defendant. | ) | ORDER DIRECTING THE CLERK TO |
| | ) | ENTER JUDGMENT FOR PLAINTIFF |
| _____ | ) | CYNTHIA ROCHA AND AGAINST |
| | | DEFENDANT MICHAEL J. ASTRUE |

        Plaintiff is represented by counsel and is proceeding in

forma pauperis with an action seeking judicial review of a final

decision of the Commissioner of Social Security (Commissioner)

denying Plaintiff's application for supplemental security income

(SSI) benefits under Title XVI of the Social Security Act (Act).

Pursuant to 28 U.S.C. § 636(c)(1), the parties have consented to

the jurisdiction of the Magistrate Judge to conduct all

proceedings in this matter, including ordering the entry of final

judgment.[1] The matter is currently before the Court on the

_____

[1] On July 12, 2007, the Honorable Oliver W. Wanger ordered the action reassigned for all purposes.

1

parties' briefs, which have been submitted without oral argument to the Honorable Sandra M. Snyder, United States Magistrate Judge.

I. Procedural History

On September 16, 2003, Plaintiff, who was born on June 30, 1966, applied for SSI, alleging disability due to carpal tunnel, a metal rod in the right hip to the knee, a metal plate in the right wrist, and fractured bone spurs in the lower back and hip since July 10, 1992. (A.R. 84-89.) After Plaintiff's claim was denied initially and on reconsideration, Plaintiff appeared with counsel and testified at a hearing held before the Honorable Bert C. Hoffman, Jr., Administrative Law Judge (ALJ) of the Social Security Administration (SSA), on May 4, 2006. (A.R. 46-59, 14, 346-90.) On September 27, 2006, the ALJ denied Plaintiff's application for benefits. (Id. at 14-24.) After the Appeals Council denied Plaintiff's request for review on April 13, 2007, Plaintiff filed the complaint in this action on June 6, 2007. (Id. at 6-8.) Briefing commenced on February 12, 2008, and was completed on March 20, 2008, with the filing of Plaintiff's reply to Defendant's opposition.

II. Standard and Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a

preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006); <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. <u>See,</u> <u>Sanchez v. Secretary of Health and Human Services</u>, 812 F.2d 509, 510 (9th Cir. 1987); <u>Jones v. Heckler</u>, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. <u>Cooper v. Bowen</u>, 885 F.2d 557, 561 (9th

1   Cir. 1987).

2      III. <u>Disability</u>

3      In order to qualify for benefits, a claimant must establish

4   that she is unable to engage in substantial gainful activity due

5   to a medically determinable physical or mental impairment which

6   has lasted or can be expected to last for a continuous period of

7   not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). A

8   claimant must demonstrate a physical or mental impairment of such

9   severity that the claimant is not only unable to do the

10  claimant's previous work, but cannot, considering age, education,

11  and work experience, engage in any other kind of substantial

12  gainful work which exists in the national economy. 42 U.S.C.

13  1382c(a)(3)(B); <u>Quang Van Han v. Bowen</u>, 882 F.2d 1453, 1456 (9th

14  Cir. 1989). The burden of establishing a disability is initially

15  on the claimant, who must prove that the claimant is unable to

16  return to his or her former type of work; the burden then shifts

17  to the Commissioner to identify other jobs that the claimant is

18  capable of performing considering the claimant's residual

19  functional capacity, as well as her age, education and last

20  fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d

21  1273, 1275 (9th Cir. 1990).

22     The regulations provide that the ALJ must make specific

23  sequential determinations in the process of evaluating a

24  disability: 1) whether the applicant engaged in substantial

25  gainful activity since the alleged date of the onset of the

26  impairment, 2) whether solely on the basis of the medical

27  evidence the claimed impairment is severe, that is, of a

28  magnitude sufficient to limit significantly the individual's

physical or mental ability to do basic work activities; 3)
whether solely on the basis of medical evidence the impairment
equals or exceeds in severity certain impairments described in
Appendix I of the regulations; 4) whether the applicant has
sufficient residual functional capacity, defined as what an
individual can still do despite limitations, to perform the
applicant's past work; and 5) whether on the basis of the
applicant's age, education, work experience, and residual
functional capacity, the applicant can perform any other gainful
and substantial work within the economy. See 20 C.F.R. § 416.920.[2]

Here, the ALJ found that Plaintiff had a combination of
medically severe impairments that included status post open
reduction internal fixation of a fractured right femur and
fractured right wrist, status post bilateral carpal tunnel
syndrome (CTS) release surgery, cervical spine degenerative joint
disease, right greater than left cubital tunnel syndrome, and
asthma. (A.R. 16.) Plaintiff's mental impairment of depression
was not severe, and Plaintiff's migraine headaches were
adequately controlled with prescription medications and did not
significantly impact her ability to work. (A.R. 16-17.)
Plaintiff's impairments did not meet or medically equal a listed
impairment, and Plaintiff retained the residual functional
capacity (RFC) to perform essentially a full range of light work,
including lifting and carrying ten pounds frequently and twenty
pounds occasionally in an eight-hour workday, standing and/or
walking and sitting six hours in an eight-hour workday, with only

---

[2] All references to the Code of Federal Regulations are to the 2006 version unless otherwise stated.

1  occasional stooping. (A.R. 17.) Plaintiff had to avoid
2  concentrated exposure to fumes, odors, dusts, gases, and poor
3  ventilation due to her history of asthma. Due to her history of
4  upper extremity impairments and carpal tunnel release surgery,
5  she was limited to frequent, as opposed to constant, handling.
6  (A.R. 17.) The ALJ rejected Plaintiff's claims of disabling
7  subjective complaints as not entirely credible. (A.R. 17-18.) He
8  concluded that Plaintiff could not perform her past relevant work
9  at the medium level as a groundskeeper/lawn maintenance worker,
10 but her nonexertional limitations did not affect the occupational
11 base of unskilled light work. Therefore, she was not disabled
12 pursuant to application of the framework of Medical-Vocational
13 Rules 202.20 and 202.21. (A.R. 22-25.)

14     IV. <u>Credibility Findings</u>

15     Plaintiff contends that the ALJ's findings concerning
16 Plaintiff's credibility were erroneous. The only reasons stated
17 for the assertion of error are that the record does not support
18 the findings concerning the ALJ's rejection of the frequency and
19 severity of Plaintiff's headaches, and that unspecified
20 complaints were supported by progress notes from Dr. Hansen and
21 by Plaintiff's persistently seeking treatment from Dr. Hansen and
22 Dr. Johnson. (Brief pp. 16-18.)

23     Plaintiff testified that she experienced migraine-type
24 headaches probably about twice a week that lasted half an hour to
25 an hour, were sometimes accompanied by throwing up, hurt "bad,"
26 and caused her to have to keep her eyes closed and to be unable
27 to stand to look at light. (A.R. 360-62.) She took her medication
28 when she felt a headache coming on, and most of the time the

medication would stop the headache, but sometimes the headache would last forty-five minutes or an hour; after the headache went away, she would relax a little bit for an hour or so until she could get herself together. (A.R. 362.)

The ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce some pain symptoms, but Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible. (A.R. 18.)

The court in <u>Orn v. Astrue</u>, 495 F.3d 625, 635 (9th Cir. 2007), summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. See <u>Fair v. Bowen</u>, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" <u>Morgan</u>, 169 F.3d at 599 (quoting <u>Lester</u>, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." <u>Id.</u> Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." <u>Id.</u>
> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see <u>Daniels v. Apfel</u>, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the

disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Fair, 885 F.2d at 603; see also Thomas, 278 F.3d at 958-59.

At step two of the sequential analysis, the ALJ concluded that Plaintiff received treatment for occasional migraine headaches, which appeared to be controlled adequately with prescription medications, and which did not significantly affect Plaintiff's ability to work. (A.R. 17.) With respect to Plaintiff's RFC, he stated:

> While the claimant testified that she experiences migraine headaches twice a week that last 30 to 60 minutes, the medical records do not corroborate the asserted frequency or severity of her headaches and suggest that they are generally controlled with appropriate medications.

(A.R. 18.)

Without specific citations to the overall record that reflect all instances of mentioning Plaintiff's headaches, Plaintiff asserts that the progress notes of Dr. Hansen, a treating physician, consistently referred to Plaintiff's headaches. (Brief at 14.) In argument relating to Plaintiff's history with Dr. Hansen, Plaintiff cited to one location in the record wherein Dr. Hansen first prescribed Imitrex for Plaintiff's headaches on February 4, 2004. (A.R. 233.) The progress note reflects that Plaintiff reported on that date that beginning at age sixteen, her whole head hurt and throbbed, she was sick to her stomach, and she experienced photophobia, all lasting up to an hour. This information is consistent with

Plaintiff's testimony.

An independent review of the record of Plaintiff's treatment with Dr. Hansen reveals that Plaintiff reported on February 19, 2004, that she had experienced the headaches four times in the month of February, which was inconsistent with her testimony in 2006. (A.R. 232.) Her dose of Imitrex medicine was increased in March 2004 because the initial dose was ineffective (A.R. 231, 320), and then the doctor prescribed Fiorinal on March 30, 2004, pursuant to Plaintiff's specific request (Plaintiff had used her sister's medication and found it helpful). Later in 2004 (the precise date is illegible), Plaintiff reported having three migraines per month, which was likewise inconsistent with her testimony. (A.R. 317.) In 2005, Dr. Godofredo Celis assessed Plaintiff's headaches as vascular and migraine in type, without an aura, and prescribed Maxalt, which did not control the symptoms. Dr. Celis then prescribed Relpax. (A.R. 288, 282.) Dr. Boyd Johnson at the San Juan Clinic assessed migraines in April 2005. (A.R. 276.)

In summary, the record generally supported Plaintiff's testimony as to the severity of her headaches. However, the record revealed reports in 2004 and 2005 of three or four headaches per month, and not per week; thus, it did not support Plaintiff's assertions concerning the frequency of her headaches. Further, Plaintiff's own testimony was to the effect that the medicine usually controlled the headaches, testimony that reasonably is interpreted as describing both the frequency and severity of the headaches.

Accordingly, the Court finds that the ALJ's conclusions

regarding Plaintiff's headaches were generally supported by substantial evidence in the record.

As to Plaintiff's remaining assertions concerning the credibility findings of the ALJ, Plaintiff's challenges are vague. Plaintiff specifically refers to only the finding regarding Plaintiff's migraine headaches, and she then makes a reference to the progress notes from "the physician" (apparently a reference to Dr. Hansen, the doctor previously referred to in the section) as supporting "the complains (sic) of the claimant." (Brief p. 16.) Plaintiff points to the fact that Drs. Johnson and Hansen considered Plaintiff to have been significantly limited in performing work activities and using her hands, stooping, and crouching; further, they prescribed medications for depression, pain, swelling, and headaches. Finally, Plaintiff argues that her persistent seeking of treatment "may be a strong indication" (Brief p. 18) of distressing symptoms and thus generally lends support to her allegation of intense and persistent symptoms.

The express basis of Plaintiff's attack on the remainder of the ALJ's reasoning is thus not that it was flawed as far as it went, but rather that other conflicting evidence warranted a contrary conclusion. However, in this regard, it is not the role of this Court to redetermine Plaintiff's credibility de novo; although evidence supporting an ALJ's conclusions might also permit an interpretation more favorable to the claimant, if the ALJ's interpretation of evidence was rational, this Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005).

10

1    Further, the record contains substantial evidence supporting

2  the ALJ's determinations. Compare, Carmickle v. Commissioner,

3  Social Security Administration, 533 F.3d 1155, 1162 (9th Cir.

4  2008).

5    The ALJ generally relied on appropriate factors in

6  evaluating Plaintiff's subjective complaints. He cited various

7  inconsistencies. (A.R. 18.) He noted that although Plaintiff

8  claimed that wrist injuries and pain in her legs, back, and arms

9  limited her ability to stand, sit, lift, grip, and sleep, and

10 further prevented work, she admitted that she had actually

11 performed physically demanding jobs (chain saw operator,

12 landscaper, ground and lawn maintenance, ranch hand, and fruit

13 packer who lifted boxes of fruit) until about May 2002, a

14 significant time after she sustained precipitating injuries in a

15 car accident in 1992. (A.R. 18, 101-08, 277.) Further, her

16 ability to perform light work was demonstrated by the daily

17 activities she admitted during testimony and in a questionnaire

18 from 2003, including helping her mother around the house and

19 performing housework, shopping weekly for groceries for herself

20 and her mother, helping out and bringing food to her daughter's

21 classroom as recently as the preceding December, readying her

22 daughter for school, leaving the house daily without assistance,

23 babysitting, driving her daughter and other relatives to and from

24 school and sporting events, visiting her family, and cooking and

25 preparing meals by herself. (A.R. 18, 377-80, 385, 141-46.) The

26 ALJ noted that Plaintiff's testimony that her pain affected her

27 concentration was contradicted by Plaintiff's admission that she

28 eventually completed her tasks and by her mother's statement that

Plaintiff did not really have problems concentrating or
remembering, but that she sometimes got sidetracked. (A.R. 18,
385-87, 145, 119.)

The data relied on by the ALJ were inconsistent with
Plaintiff's claim of inability to perform any gainful employment,
and they were consistent with an ability to perform light work,
which involves lifting no more than twenty pounds at a time with
frequent lifting or carrying of objects weighing up to ten
pounds, a good deal of walking or standing, and/or sitting most
of the time. 20 C.F.R. § 416.967(b).

Inconsistent statements are matters appropriately considered
in evaluating a claimant's subjective complaints. In rejecting
testimony regarding subjective symptoms, permissible grounds
include a reputation for dishonesty, conflicts or inconsistencies
between the claimant's testimony and his conduct or work record,
internal contradictions in the testimony, and testimony from
physicians and third parties concerning the nature, severity, and
effect of the symptoms of which the claimant complains. Moisa v.
Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Thomas v. Barnhart,
278 F.3d 947, 958-59 (9th Cir. 2002). The ALJ may consider whether
the Plaintiff's testimony is believable or not. Verduzco v.
Apfel, 188 F.3d 1087, 1090 (9th Cir. 1999).

Further, the ALJ relied on treatment records that reflected
only very conservative treatment and few objective findings for
Plaintiff's complaints of back, arm and leg pain. (A.R. 18.) The
treatment records are discussed in detail below in connection
with the ALJ's treatment of the opinions of Plaintiff's treating
physicians. However, the records generally reflect conservative

treatment with pain and anti-inflammatory medications, and few objective findings. An ALJ may rely on the conservative nature of treatment or a lack of treatment in rejecting a claimant's subjective complaint of pain. <u>Johnson v. Shalala</u> 60 F.3d 1428, 1433-34 (9th Cir. 1995).

Further, as the ALJ expressly noted, x-rays of Plaintiff's right femur, right knee, coccyx, and left elbow had generally shown satisfactory alignment and no other significant acute abnormalities. (A.R. 19.) Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, <u>Light v. Chater</u>, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, <u>Moisa v. Barnhart</u>, 367 F.3d 882, 885 (9th Cir. 2004); <u>Morgan v. Commissioner</u> 169 F.3d 595, 600 (9th Cir. 1999).

In the present case, although there might have been factors supporting Plaintiff's credibility, the ALJ nevertheless articulated clear and convincing reasons, supported by substantial evidence, for discrediting Plaintiff's subjective complaints of pain. <u>Cf.</u> <u>Batson v. Commissioner of the Social Security Administration</u>, 359 F.3d 1190, 1196 (9th Cir. 2004).

V. <u>Expert Opinions</u>

A. <u>Background</u>

Plaintiff fractured her right femur and proximal tibia in a motor vehicle accident in 1992. The accident left a closed IM rod in the right femur, which healed with the rod still in place; further, Plaintiff underwent a bone graft from the right iliac crest to the right wrist that left a screw in the right wrist.

1  Both injuries appeared to have healed well according to

2  consulting orthopedist Dr. Lee in 2005. Plaintiff returned to

3  work after recovery and worked until May 2002, when her residual

4  pain from those injuries prevented it. (A.R. 241, 277, 349-51.)

5          B. <u>Treating Physicians</u>

6      Plaintiff challenges the ALJ's rejection of the opinions of

7  two treating physicians, Drs. Hansen and Johnson.

8      The standards for evaluating the opinions of treating

9  sources are as follows:

>           By rule, the Social Security Administration favors
>           the opinion of a treating physician over
>           non-treating physicians. See 20 C.F.R. § 404.1527.
>           If a treating physician's opinion is
>           "well-supported by medically acceptable clinical
>           and laboratory diagnostic techniques and is not
>           inconsistent with the other substantial evidence
>           in [the] case record, [it will be given]
>           controlling weight." <u>Id.</u> § 404.1527(d)(2). If a
>           treating physician's opinion is not given
>           "controlling weight" because it is not
>           "well-supported" or because it is inconsistent
>           with other substantial evidence in the record, the
>           Administration considers specified factors in
>           determining the weight it will be given. Those
>           factors include the "[l]ength of the treatment
>           relationship and the frequency of examination" by
>           the treating physician; and the "nature and extent
>           of the treatment relationship" between the patient
>           and the treating physician. <u>Id.</u> §
>           404.1527(d)(2)(i)-(ii). Generally, the opinions of
>           examining physicians are afforded more weight than
>           those of non-examining physicians, and the
>           opinions of examining non-treating physicians are
>           afforded less weight than those of treating
>           physicians. <u>Id.</u> § 404.1527(d)(1)-(2). Additional
>           factors relevant to evaluating any medical
>           opinion, not limited to the opinion of the
>           treating physician, include the amount of relevant
>           evidence that supports the opinion and the quality
>           of the explanation provided; the consistency of
>           the medical opinion with the record as a whole;
>           the specialty of the physician providing the
>           opinion; and "[o]ther factors" such as the degree
>           of understanding a physician has of the
>           Administration's "disability programs and their
>           evidentiary requirements" and the degree of his or

14

her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9ᵗʰ Cir. 2007).

With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been recently restated:

> The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9ᵗʰ Cir. 2007).

### 1. Dr. Hansen

Plaintiff argues that the progress notes and clinical studies supported the opinions of Dr. Hansen; because they were supported by the record, Dr. Hansen's opinions should have been adopted.

Dr. Hansen, who treated Plaintiff between February 2002 and

December 2005 (A.R. 226-51, 278-80, 312-20), rendered several opinions that Plaintiff was disabled.

In February 2002, Dr. Hansen opined in a form prepared for the Tulare County Health and Human Services Agency (HHSA) that Plaintiff, who had been to job training, could not work full-time, could work four hours per day, but was unable to use her right elbow or perform heavy lifting due to low back pain based on a narrowing of the L4-L5 inter-space with spurring, and because of tennis elbow on the right that he expected to improve in about one month. (A.R. 280.)

In April 2002, Dr. Hansen opined that Plaintiff was disabled, could not work for more than four hours, and could not sit due to a rod in her right hip and a one-inch bone spur off the right acetabulum, which had fractured; she also had bilateral tennis elbow. (A.R. 250.)

In January 2003, Dr. Hansen's progress notes stated that Plaintiff had pain in the right hip, was unable to walk well, could not do her landscaping and lawn care job any more for even two hours a day, and could not do work requiring standing or walking. The doctor felt that Plaintiff was disabled; he referred to progress notes and copies of x-rays, which included a study of the right knee that showed possible joint effusion, intramedullary rod visible in the distal femur, and deformity of the proximal tibia consistent with an old, healed fracture. (A.R. 242-43.)

In March 2004, Dr. Hansen opined that Plaintiff was disabled for what he estimated was at least three more months due to calcific bodies around an old fracture of the right hip. (A.R.

16

279.)

On August 12, 2004, Dr. Hansen stated that Plaintiff was and had been unable to work or participate in a training or education program from "2000 ?" to "[p]robably never." (A.R. 278.) Dr. Hansen commented that a spur had grown on the coccyx. On a portion on the medical report form for the HHSA that asked for accommodations needed in order for Plaintiff to work or train, Dr. Hansen wrote that there was a spur on Plaintiff's coccyx, Plaintiff was unable to sit, Plaintiff was unable to walk well due to a spur on the right hip, and she had painful elbows. (Id.)

In September 2004, Dr. Hansen opined on a medical report form for the Tulare County HHSA that Plaintiff could not work or participate in a job training program or classroom education program because Plaintiff could not sit due to a deformed coccyx; her disability was expected to last from the present and for one year until early September 2005. Other comments included three fractures over her lifetime of the coccyx, a plate in the right wrist, and spurs in the right hip. (A.R. 326.)

The ALJ adverted to each of the foregoing opinions from Dr. Hansen and concluded that they were egregiously accommodative, inconsistent with Dr. Hansen's own and the overall objective findings, completely unsupported by any credible evidence of record, and not worthy of significant probative value. (A.R. 21, 20-21, 19.) The ALJ instead credited the opinion of consulting examiner Dr. Rios concerning exertional limitations (A.R. 21), the opinion of treating orthopedist Dr. Lee (A.R. 20), the opinions of neurologist Godofredo Celis, M.D., and surgeon Dr. Porter (A.R. 19), and non-examining state agency consultant

physician James Glaser, M.D. (A.R. 22).

As the foregoing analysis confirms, the ALJ appropriately concluded that Plaintiff's subjective complaints of inability to perform even light work were unsupported, as were the intensity, persistence, and limiting effects of the symptoms as claimed by Plaintiff. (A.R. 17-18.) The fact that an opinion is based primarily on the patient's subjective complaints may be properly considered in weighing the opinion. Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Where a treating source's opinion is based largely on the Plaintiff's own subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's claim as to those subjective symptoms, the ALJ may reject the treating source's opinion. Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989); Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992).

Likewise, a conclusional opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995).

Finally, it is permissible to rely on the Plaintiff's testimony regarding her impairments in discrediting a treating physician's opinion. Fisher v. Schweiker, 568 F.Supp. 900, 903 (N.D.Cal. 1983).

Here, the ALJ noted the fact that Dr. Hansen's treatment notes discussed the claimant's subjective complaints, requests for her disability paperwork to be completed, discussions regarding the denial of her disability, a desire to appeal the adverse decision, and requests for information for her lawyer to update her disability status. (A.R. 20, 248-49, 237, 231.) He

concluded that the treatment notes suggested that Dr. Hansen relied heavily on Plaintiff's assertions of disability in completing the forms and writing the statements. (A.R. 20.) The record reflects that Dr. Hansen's assessments of functional limitations were consistent with, and were likely generated by, Plaintiff's subjective complaints. The record supports the conclusion that the opinions were inconsistent with Dr. Hansen's own findings and other findings in the record.

The objective findings were generally minimal and benign despite Plaintiff's complaints of pain. Radiological studies of the right femur, right knee, coccyx, and left elbow generally showed satisfactory alignment and no other significant acute abnormalities. (A.R. 208 [April 2002 x-ray of the right femur revealed healed fracture with satisfactory alignment, heterotropic bone formation lateral to the right acetabulum, and no significant change since study in 2000], 206 [2002 study of the left elbow negative for evidence of fracture, dislocation, synovitis, or effusion], 204 [2003 study of the right knee revealed possible joint effusion, intramedullary rod visible in the distal femur, and deformity of the proximal tibia consistent with an old, healed fracture], 228 [November 2003 study of the tail bone revealing coccyx intact without evidence of fracture or dislocation], 227 [2004 study of the right hip and femur showed no evidence of acute fracture or significant interval change since the exam in 2002, intramedullary rod in satisfactory position without evidence of hardware failure, stable early degenerative changes of the right hip, and dystrophic calcifications within the capsule versus myositis ossificans

1  arising from the superolateral acetabulum], 308 [August 2004
2  study of the right wrist showing plate and screw fixation of the
3  distal right radius with fragments maintained in good position,
4  alignment satisfactory, hardware overlapping portion of the
5  lunate bone that was incompletely visualized, no new fracture
6  apparent; and an additional study of the sacrum and coccyx
7  revealed metallic foreign bodies projected over the right pelvis,
8  with no sacral or coccygeal abnormalities otherwise seen]; 331
9  [January 2006 study of the left elbow revealed negative
10 examination without evidence of elbow effusion].)

11     Treatment records of Dr. Hansen generally documented
12 complaints from Plaintiff as to pain and tenderness accompanied
13 by relatively benign objective findings, and treatment consisting
14 of medication. (A.R. 226-51 [February 2002 through March 2004,
15 revealing complaints of pain and tenderness from Plaintiff but
16 few objective findings; full extension and flexion with pain
17 (249), fair motion in elbows with no swelling or redness despite
18 complaints of pain (247-48), no popliteal tenderness, no
19 swelling, twist negative, elbows better but arms went to sleep,
20 only minimal osteoarthritis of right knee (A.R. 243), fair motion
21 in the elbow and ability to cross legs satisfactorily in May 2003
22 despite complaints of elbows still hurting and rod in right hip
23 (A.R. 237), medications helping pain in August and September 2003
24 (234-35), no redness or mass in tender coccyx in November 2003
25 (234), fair range of motion in hurting elbows, asked for a
26 nebulizer but no wheezes detected in February 2004 (233), spur in
27 right acetabulum required orthopedic consult (232), good range of
28 motion in March 2004 in elbows claimed to be painful and numb

20

1 (231)]; 312-20 [March 2004 through December 2005, revealing in
2 March 2004 no wheezes, lungs clear to auscultation, no
3 tenderness, no effusions in the extremities, normal strength and
4 range of motion except weak grip bilaterally, no tenderness in
5 the back, negative straight leg raise, and intact sensory and
6 motor portions of the neurological exam. (A.R. 319. Despite pain
7 in the elbows and feet, the doctor found that Plaintiff walked
8 rapidly, had fair range of motion, and had no swelling or
9 localization in the elbow (316); x-rays showed a right wrist
10 plate in good position in August 2004 (315), and a myography
11 report showed left tarsal tunnel syndrome in February 2005
12 (313)]. In 2003, Plaintiff reported being well and having no
13 problems, although she reported some pain. (A.R. 21, 236.)

14      The record supports the ALJ's specific examples of
15 inconsistency between the progress notes and the opinions of
16 disability.

17      The ALJ stated that although Dr. Hansen considered a coccyx
18 spur or deformity to be a basis for disability, x-rays of
19 November 2003 revealed no coccyx abnormalities. (A.R. 20, 228.)
20 Likewise, the ALJ recounted that although Dr. Hansen noted a
21 right hip bone spur as a basis for disability, in July 2005 Dr.
22 Lee found that calcifications on the right hip and wrist
23 fractures were either asymptomatic or did not warrant any
24 treatment based on x-ray studies and his mild objective
25 examination findings. (A.R. 20, 277.) Dr. Lee's note of July 2005
26 revealed that the fracture and bone graft on the right arm healed
27 well; the fracture of the right femur and IM rod all healed
28 without any problem; an x-ray of the right hip revealed

21

1   calcification of capsules in the right hip, but the Fabere test
2   was negative; an x-ray of the pelvis revealed calcification on
3   the anterior iliac spine with retained bone graft, but it was
4   asymptomatic; x-ray of the left wrist revealed a healing fracture
5   with plate and screw, which had been there for more than fourteen
6   years and did not cause any problem; and thus, Dr. Lee would
7   advise Plaintiff to leave it alone. (A.R. 277.)

8       Therefore, substantial evidence supported the ALJ's
9   reasoning that Dr. Hansen's findings were mild, and that her
10  treatment notes and the other medical evidence of record did not
11  support Dr. Hansen's statements of disability. (A.R. 20.)

12      Further, the ALJ expressly relied on the contrary opinion of
13  treating orthopedist Dr. J. R. Lee. (A.R. 20.) In December 2002,
14  Dr. Lee examined Plaintiff at the request of Dr. Hansen, who had
15  diagnosed triceps tendonitis and referred Plaintiff with
16  bilateral elbow pain localized at the triceps tendon. (A.R. 244.)
17  Dr. Lee found a scar on the right wrist with palpable metal
18  underneath the skin; elbows with identical, minimal tenderness at
19  the lateral epicondyle and the triceps tendon area, full range of
20  motion, good strength, no swelling or ecchymosis, and no warmth
21  to the touch. An x-ray from the previous month at Kaweah Delta
22  District Hospital revealed a negative left elbow. Dr. Lee's
23  impression was tendonitis of the right and left elbows localized
24  at the common extensor tendon and triceps tendon area, with very
25  minimal symptoms. Id. His opinion was that surgical care was not
26  required; Plaintiff was advised to leave it alone, be rechecked
27  on a p.r.n. basis, and use occasional medication for inflammation
28  and pain; Plaintiff requested Vicodin. Id.

In February 2003, at Dr. Hansen's request, Dr. Lee evaluated Plaintiff, who reported right knee pain for two months without any obvious, recent injury. (A.R. 241.) Examination revealed a knee that was not effused, full range of motion, no crepitus, very stable medial and lateral collateral ligament, very stable ACL and PCL, no Bake's cyst, normal gait, a thigh wound healed without drainage, a stable femur that was all healed with no muscle atrophy in the quad or hamstring, and a well-healed fracture of the proximal tibial metaphysis that did not seem to involve the joint. The impression was post-traumatic mild arthritis of the right knee, very minimally symptomatic. The plan was no further treatment, with directions to take non-sterioidal anti-inflammatory drugs or pain medication occasionally for pain, and to be rechecked p.r.n. (A.R. 241.)

Dr. Lee's opinion rested upon independent findings and was consistent with the weight of the medical evidence of record. It constituted substantial evidence, and the reasoning stated by the ALJ for crediting it instead of Dr. Hansen's was specific and legitimate.

Further, the record supported the ALJ's express and appropriate consideration of the fact that Dr. Lee was an orthopedist, but Dr. Hansen was not, and therefore her opinion regarding Plaintiff's coccyx, spine, hip, and elbows and related assessment of disability would be accorded less deference because it conflicted with the findings of the examining orthopedists. (A.R. 21.) See, 20 C.F.R. § 416.927(d)(2).

The record likewise supports the ALJ's reasoning that although tests recently completed by a neurologist had suggested

23

1  cubital tunnel syndrome and precipitated a recommendation for
2  elective cubital tunnel release surgery, Plaintiff's treating
3  neurologist, Dr. Godofredo Celis, had noted improvement. (A.R.
4  21.) The record reflects that Dr. Celis recorded less pain in
5  late 2004 and January 2005 while Plaintiff was on Neurontin (A.R.
6  287-90), and later reported that an EMG in May 2006 reflected
7  only a mildly abnormal nerve conduction study of the arms
8  indicative of a right ulnar sensory neuropathy, but with
9  improvement of interval when compared to the last study on April
10 1, 2004. (A.R. 336.)

11      Accordingly, the Court concludes that the ALJ stated
12 specific, legitimate reasons for finding that Dr. Hansen's
13 opinions were not worthy of significant probative value. (A.R.
14 21.)

15               2. Dr. Johnson

16      Plaintiff contends that the ALJ erred in rejecting the
17 opinion of Dr. Boyd Johnson.

18      The ALJ noted that the treatment records of Dr. Johnson from
19 May 2005 through March 2006 (A.R. 266-76, 321-25) reflected
20 minimal and generally benign objective findings and conservative
21 treatment for Plaintiff's complaints of pain. (A.R. 21.) The
22 record supports this finding. (Id. at 274 [no pain in June 2005],
23 270 [in August 2005 Plaintiff complained of pain and
24 paresthesias, but examination revealed general condition,
25 extremities, and neurological exam within normal limits with no
26 abnormalities noted], 269 [in November 2005, Plaintiff complained
27 of whole body pain and pain radiating to the neck and head from
28 the left elbow, but examination showed extremities and

24

1  neurological exam to be within normal limits, strength 5/5, and
2  good range of motion], 268 [in November 2005, a study of the
3  cervical spine without contrast revealed mild cervical
4  spondylosis with a slight reversal of the normal cervical
5  lordosis, no significant central or peripheral spinal canal
6  stenosis at any cervical level, no significant neural foraminal
7  stenoses, and no fractures or subluxations], 325 [in December
8  2005, Plaintiff was diagnosed with bronchitis but exam revealed
9  lungs to be clear except occasional rhonchi, clearing somewhat
10  with cough, and no wheezes or rales], 324 [bronchitis in January
11  2006 accompanied by wheezing but with the ability to walk about,
12  Plaintiff still smoking, arm painful, but examination showed
13  extremities and neurological exam to be within normal limits],
14  and 321 [in March 2006 left upper back pain, but good range of
15  motion in the neck, weak right arm but good range of motion].)

16       The ALJ reasoned that the record was inconsistent with the
17  very restrictive functional limitations imposed by Dr. Johnson on
18  April 5, 2006, in a residual functional capacity assessment form
19  written in support of Plaintiff's disability application. (A.R.
20  21, 301-05.) Dr. Johnson opined that Plaintiff could occasionally
21  lift less than ten pounds and rarely lift ten pounds, twist, or
22  climb ladders; never stoop or crouch; occasionally climb stairs;
23  sit, stand, and walk for less than two hours in an eight-hour
24  day, with a need to walk every twenty minutes for five minutes,
25  take breaks every twenty to thirty minutes, shift position at
26  will from sitting, standing, and walking, and be subject to
27  significant limitations in doing repetitive reaching, handling,
28  or fingering. (Id.) Dr. Johnson further concluded that

Plaintiff's pain was severe enough to interfere with attention
and concentration needed to perform simple work tasks, and she
was likely to be absent more than four days per month. (Id.) Dr.
Johnson had seen Plaintiff monthly for about ten months, had
referred her to specialists, and had diagnosed a herniated
cervical disk at C4, left ulnar nerve impingement with fair
prognosis with possible chronic pain problems based on symptoms
of waxing and waning pain in the neck down to the left arm that
were worse with movement, pain in the left arm with numbness and
weakness, an MRI showing herniation of the disk at C4-5, and a
nerve study at Dr. Solis's office. (Id.) Plaintiff's symptoms
could be expected to last at least twelve months and would
interfere with Plaintiff's concentration and attention such that
Plaintiff could maintain attention and concentration for only
twenty minutes at a time; Plaintiff could tolerate low stress
jobs. (Id.)

    The ALJ relied on the objective evidence of record,
including Dr. Johnson's own treatment records. (A.R. 22.) Dr.
Johnson's notes reflect findings upon examination of weak grip
and pain along the forearm in May 2005; general exam,
extremities, and neurological exam within normal limits, with
paresthesias in August; pain assessment of no pain in June 2005;
in November 2005, complaints of whole body pain and pain from the
left ulnar nerve radiating back to the neck and head, with an
exam showing general exam, extremities, and neurological exam
within normal limits, strength 5/5, and good range of motion; CT
scan of the cervical spine in November 2005 showing mild cervical
spondylosis with a slight reversal of the normal cervical

lordosis; mild cervical disk bulges with protrusion of the right dorsal margin of the C4/5 disk creating mild to moderate anterolateral extradural impression on the thecal sac, with no severe central or peripheral spinal canal stenoses noted at any cervical level, no fractures, and no subluxations. (A.R. 266-76.) It further reflects that in January 2006, Plaintiff complained of arm and elbow pain, but examination of the head, neck, and extremities, as well as the neurological exam, were within normal limits; in February 2006, Plaintiff reported that a doctor wanted to operate based on an MRI of the neck and arm, and she complained of right arm weakness. Dr. Johnson's examination revealed good range of motion of the neck and right arm, but weak right arm hold, with upper back pain, all treated with medication. (A.R. 321-25.)

The ALJ also relied on inconsistencies, such as that presented by the opinions of the other examining and reviewing physicians, particularly that of Dr. Lee, whose opinion and findings have been previously set forth and shown to have received appropriate weight. (A.R. 22.)

However, the Court notes that Dr. Lee's opinion concerning Plaintiff's arm and neck conditions was rendered in 2002 (A.R. 244), and thus Dr. Lee's opinion concerning Plaintiff's upper extremities was not informed by the much later examinations and diagnostic tests, available to treating physician Dr. Johnson, showing ulnar impingement and herniation of the disk at C4-5. (A.R. 290 [Dr. Celis in October 2004 found positive Tinel's sign in the proximal cupital tunnel bilaterally]; A.R. 287 [treating neurologist Dr. Celis noted in January 2005 that NCV/EMG of the

upper extremities revealed bilateral ulnar and median sensory neuropathies with possible early right ulnar entrapment], 336 [in May 2006, Dr. Celis tested motor and sensory nerves and noted physical findings of decreased pin and vibration in the right hypothenar region, prolonged right ulnar sensory latency indicative of a right ulnar sensory neuropathy, although interval improvement was noted when compared to the last study of April 2004]; A.R. 332 [studies taken in January 2006 of the cervical spine revealed disk space narrowing with anterior osteophyte formation at C5-6, C3-4 bilateral foraminal encroachment and left-sided C5-6 foraminal encroachment], 329 [Dr. Porter's exam revealed positive Tinel's on the left, equivocal on the right, decreased sensation in the ulnar nerve distribution on the left and right, intact motor function but positive Spurling's test with pain radiating down the left arm].)

Thus, the passage of time and collection of additional data rendered Dr. Lee's findings of less weight and likewise caused isolated reliance on Dr. Johnson's notes to be of less significance. However, the ALJ appropriately relied on Plaintiff's testimony.

The Court notes that in January 2006, Plaintiff was referred by Dr. Johnson to Dr. Steven Porter for arthroscopic surgery for hand numbness. (A.R. 327-333.) Studies of the right elbow taken January 13, 2006, reflected a negative exam, (A.R. 333); five studies of the cervical spine taken at the same time reflected disk space narrowing with anterior osteophyte formation at C5-6, mild cervical dextroscoliosis, intact odontoid, C3-4 bilateral foraminal encroachment with left-sided C5-6 foraminal

encroachment; the impression was significant arthritic change, and the advice was to consider an MRI to follow up to assess the degree of neural foraminal stenosis on the left. (A.R. 332.) An x-ray on the same date of the left elbow revealed a negative examination. (A.R. 331.) Plaintiff complained of pain radiating up and down the arm with all of both hands going numb on occasion, on the left more than the right and mostly at night. (A.R. 329.) A physical exam showed positive Tinel's sign on the left, equivocal on the right; decreased sensation in the ulnar nerve distribution on the left with the same appearing on the right; carpal tunnel releases bilaterally, which had worked out well; intact motor function and full range of motion in the cervical spine, but positive Spurling's test with pain radiating down the arm. On January 13, 2006, Dr. Porter opined that Plaintiff had cervicalgia with possible radiculopathy, and cubital tunnel syndrome; the plan was to have her return with reports of an EMG and MRI. An MRI of the left arm revealed mediolateral position of the ulnar nerve with borderline entrapment between the cubital retinaculum and posterior aspect medial epicondyle evident with paucity of perineural fat, which might represent mild ulnar impingement exacerbated by flexion of the elbow; and no evidence of ulnar neuritis. (A.R. 328.) On March 2, 2006, Dr. Porter's note of a follow-up appointment stated that the MRI showed near-subluxation of the ulnar nerve with loss of peroneal fat; the EMG showed swelling of the median and ulnar nerves of both arms, right more than left; and CT of the cervical spine showed mild bulging at the C4-5 level, which could be causing some of her problems. The plan was to try

29

operative treatment, namely, cubital tunnel release. (A.R. 327.)

The ALJ noted the more recent studies and the opinion of Dr. Porter from 2006. (A.R. 19.) He also noted that the record contained no subsequent evidence concerning Plaintiff's cubital tunnel symptoms other than an electro-diagnostic report that showed interval improvement in the ulnar sensory neuropathy when compared to the earlier April 2004 study, which Dr. Porter apparently relied on when in March 2006 he stated he would schedule Plaintiff for elective cubital tunnel release surgery. (A.R. 19.) The ALJ was referring to Dr. Celis's May 2006 report in which he found normal nerve conduction except for a mildly abnormal nerve conduction study of the arms indicating a right ulnar sensory neuropathy, but interval improvement noted when compared to the last study in April 2004.

The Court notes, however, that improvement in the interval apparently did not change the impression resulting from the study, namely, that the study was indicative of a right ulnar sensory neuropathy. (A.R. 336.) Thus, the study does not appear to constitute a valid basis for challenging Dr. Celis's findings or Dr. Porter's reliance thereon.

The Court concludes that although the ALJ's reliance on the Plaintiff's testimony regarding her activities was appropriate, the ALJ failed to state specific and legitimate reasons, supported by substantial evidence, for concluding that Dr. Johnson's assessment was unsupported by the overall evidence of record and worthy of very limited probative value. (A.R. 22.) To the contrary, the later studies, examinations, and findings of Plaintiff's treating doctors supported Dr. Johnson's assessment

30

1  and undercut the ALJ's reasoning concerning Plaintiff's treating
2  source, Dr. Johnson.

3          C. <u>Examining Physician Dr. Rios</u>

4          Plaintiff argues that the ALJ erred in rejecting the opinion
5  of examining internist Dr. Tomas B. Rios, M.D.

6          The ALJ considered the opinion of Dr. Rios, who had examined
7  Plaintiff in December 2003. (21, 221-25.) Plaintiff reported pain
8  in the right hip down to the right thigh and knee due to a
9  healed, reduced, compound fracture of the right femur sustained
10 in the accident of July 1992; pain in the right wrist due to a
11 fracture that was surgically repaired with bone grafting; carpal
12 tunnel, for which Plaintiff had already undergone surgical
13 release bilaterally; pain along the lumbosacral area; asthma with
14 Plaintiff's continuing to smoke cigarettes; and ability to engage
15 independently in activities of daily living, including driving.
16 (A.R. 221-22.) Plaintiff reportedly managed her pain with
17 Celebrex and Vicodin.

18         Dr. Rios's examination revealed normal chest, lungs, and
19 gait; previous surgical scarring of the right leg with no gross
20 deformity, previous surgical scarring from previous carpal tunnel
21 surgery release, evidence of previous surgical scarring with some
22 tenderness from examination of the distal radials, intact fine
23 and gross finger manipulation, 5/5 motor strength in all
24 extremities, symmetrical appearance of muscle bulk with normal
25 muscle tone, adequate and strong grip strength bilaterally,
26 smooth and brisk ambulation without significant gait alteration,
27 no sensory abnormalities, and no focal findings involving the
28 upper or lower extremities. (A.R. 223-24.) Dr. Rios diagnosed

status post open reduction internal fixation of a fractured right femur and fractured right wrist, status post release of carpal tunnel syndrome bilaterally, chronic back pain, and asthma. He opined that Plaintiff's significant injuries resulted in significant labor-restricting complications from multiple joint pain, but there had been good recovery, and range of motion was essentially preserved, although Plaintiff would nevertheless have unspecified difficulty with frequent squatting, crouching, or climbing activities, or forceful grasping and twisting with both hands; her asthma was stable, but she was precluded from working in an enclosed environment where there was frequent exposure to smoke, dust or fumes that could exacerbate her reactive airway disease; and with respect to her chronic back pain, there was fairly preserved lumbar flexion/extension mobility. (A.R. 224-25.)

Relying on the overall evidence of record and the assessment of state agency medical consultant Dr. James Glaser, M.D., from April 2003 (A.R. 210-20), the ALJ disagreed with Dr. Rios's failure to assess exertional limitations; instead, the ALJ determined that Plaintiff was restricted to light exertional activities. (A.R. 21.)

The ALJ rejected, however, Dr. Rios's non-exertional limitations except for the environmental restrictions that were based on Plaintiff's asthma. (A.R. 21.) In so doing, the ALJ stated:

> Based on the restriction to light work found herein, the undersigned concludes that the consultative examiner's recommended non-exertional limitations were not warranted except for the asthma precautions.

(A.R. 21.)

The ALJ's reasoning is not legitimate. First, the Court notes that the RFC for light work does not address the postural and manipulative limitations. Therefore, reasoning that a more restrictive, light level of exertional limitations makes a lesser degree of non-exertional limitations appropriate is not logical. Further, the restriction to light work was based largely on the overall evidence of record, which, as has been previously noted, contained opinions assessing limitations on Plaintiff's exertional and non-exertional capacities; it was also based on the ALJ's adoption of Dr. Glaser's opinion of April 2003, which in turn was based on the whole record, and which provided that Plaintiff could perform only the exertional activities of light work with specified postural and manipulative limitations. (A.R. 21, 211.)

Dr. Glaser was a non-examining consultant who, in addition to assessing a light work exertional level, also assessed non-exertional, postural limitations, including only frequent climbing, balancing, kneeling, crouching, and crawling, and only occasional stooping; further, Plaintiff was limited to frequent grasping and twisting with bilateral wrists and handling due to a history of bilateral CTS and fractured right wrist post-surgical open reduction and internal fixation. (A.R. 212-13.) This RFC was based on evidence that Plaintiff had back pain with normal range of motion, and negative straight leg raising. (A.R. 212.)

Again, the ALJ considered and expressly adopted the April 2003 opinion of state agency consultant James Glaser, M.D., and thus appeared expressly to adopt the limitations of occasional stooping, frequent handling, and environmental limitations. (A.R.

33

22, 210-17.)

Further, the evidence on which Dr. Glaser relied did not support lesser postural restrictions than those proposed by Dr. Glaser; on the contrary, examining Dr. Rios specifically stated Plaintiff would have difficulty with frequent squatting, crouching, climbing, and forceful grasping and twisting with both hands. The other opinions of an RFC with fewer restrictions, namely, the opinions of state agency consultants Drs. Sharbaugh and Wong of 2004 (A.R. 254-61), were expressly rejected as to exertional limitations and stated to be less consistent with the overall evidence than the opinion of Dr. Glaser; hence, they do not appear to constitute a substantial basis for assessing non-exertional limitations.

The opinion of an examining physician is entitled to greater weight than the opinion of a nonexamining physician. _Lester v. Chater_, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted opinion of an examining physician may be rejected only if the Commissioner provides clear and convincing reasons for rejecting it. _Id._; _Edlund v. Massanari_, 253 F.3d 1152, 1158-59 (9th Cir. 2001). The opinion of a nontreating but examining physician constitutes substantial evidence, and may even be relied upon instead of the contradictory opinion of a treating physician, where it is based on independent clinical findings that differ from those of the treating physician. _Andrews v. Shalala_, 53 F.3d 1035, 1041 (9th Cir. 1995).

The opinion of a nontreating, nonexamining physician can amount to substantial evidence as long as it is supported by other evidence in the record, such as the opinions of other

34

examining and consulting physicians, which are in turn based on independent clinical findings. <u>Andrews v. Shalala</u>, 53 F.3d at 1041. An ALJ can reject the opinion of an examining physician and adopt the contradictory opinion of a nonexamining physician only for specific and legitimate reasons that are supported by substantial evidence in the record. <u>Moore v. Commissioner of Social Security Administration</u>, 278 F.3d 920, 925 (9th Cir. 2002) (quoting <u>Lester v. Chater</u>, 81 F.3d at 830-31).

The Court concludes that the non-exertional limitations of Dr. Rios were not validly rejected. Therefore, the limitations imposed by Dr. Rios must be accepted. Where the Commissioner has failed to provide adequate reasons for rejecting the opinion of a treating or examining physician, a reviewing court credits them as a matter of law. <u>Lester v. Chater</u>, 81 F.3d 821, 834 (9th Cir. 1995).

D. <u>Remedy</u>

In summary, the ALJ's decision was devoid of legally sufficient reasoning concerning the ALJ's rejection of the postural and manipulative restrictions set by examining consultant Dr. Rios. The ALJ failed to state reasons to support his handling of this significant probative evidence. Further, the precise nature of these restrictions are somewhat vague (i.e., "difficulty with frequent squatting, crouching, or climbing activities, or forceful grasping and twisting with both hands" (A.R. 224)), and thus they must be interpreted by the ALJ and put into precise language reflecting Plaintiff's RFC in terms useful to the remainder of the disability analysis.

Defendant argues that even if the somewhat vague, non-

35

exertional, postural and manipulative limitations set forth by

Dr. Rios were interpreted themselves to be postural limitations,

it would not make a difference with respect to the determination

of Plaintiff's disability because the limitations in question do

not significantly impact the light exertional base. The Court

rejects this contention because light work is defined by 20

C.F.R. § 416.967(b) as follows:

> Light work involves lifting no more than 20
> pounds at a time with frequent lifting or carrying
> of objects weighing up to 10 pounds. Even though
> the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting
> most of the time with some pushing and pulling of
> arm or leg controls. To be considered capable of
> performing a full or wide range of light work, you
> must have the ability to do substantially all of
> these activities. If someone can do light work, we
> determine that he or she can also do sedentary
> work, unless there are additional limiting factors
> such as loss of fine dexterity or inability to sit
> for long periods of time.

If the non-exertional limitations of Dr. Rios are accepted

as true, then there remain questions regarding Plaintiff's RFC

with respect to pushing and pulling of arm or leg controls.

Further, although Soc. Sec. Ruling 85-15 provides that a sole

limitation as to climbing would not ordinarily have a significant

impact on the broad world of work, here Plaintiff has other

postural limitations. Further, limitations in forceful grasping

and twisting with both hands must be evaluated with respect to

their effect on the range of light work. As Defendant admits,

light exertional work requires the use of the hands to grasp,

hold and turn objects; any limitation of these functional

abilities must be considered very carefully to determine the

impact on the size of the remaining occupational base of a person

who is otherwise found functionally capable of light work. Soc.
Sec. Ruling 83-14 at p. 4. Handling, which includes seizing,
holding, grasping, turning, or otherwise working primarily with
the whole hand or hands, is required in almost all jobs;
significant limitations may eliminate a large number of
occupations a person could otherwise do, and varying degrees of
limitations would have different effects. Soc. Sec. Ruling 85-15
at 6. The meaning of "forceful" in the manipulative limitations
assessed in the present case must be explored and expressed. The
extent to which pertinent restrictions affect fine manual
dexterity must also be determined because the loss of fine manual
dexterity narrows light ranges of work more than it does the
heavier ranges of exertional work. Soc. Sec. Ruling 85-15 at p.

Finally, as set forth hereinabove, some of the reasons
stated for rejecting the opinion of treating physician Dr.
Johnson were not specific and legitimate or supported by
substantial evidence. These reasons related to the medical
record, the totality of which is consistent with Dr. Johnson's
opinion. A significant reevaluation of the opinion in light of
that record could change the ALJ's conclusion concerning Dr.
Johnson's opinion as well as the ALJ's evaluation of Plaintiff's
credibility.

Accordingly, the Court concludes that the matter must be
remanded to permit the ALJ to reconsider Dr. Johnson's opinion,
and to reconsider Plaintiff's RFC when the non-exertional
limitations imposed by Dr. Rios, as interpreted by the ALJ in
light of all the evidence, are accepted. The ALJ shall continue
the sequential analysis, obtaining evidence from a vocational

1  expert to the extent necessary.

2      VI. <u>Disposition</u>

3      In accordance with the foregoing, the Court concludes that

4  the ALJ's decision was not supported by substantial evidence in

5  the record as a whole and was not based on proper legal

6  standards.

7      Accordingly, it IS ORDERED that

8      1. Plaintiff's social security complaint IS GRANTED IN PART,

9  and

10      2. The matter IS REMANDED pursuant to sentence four of 42

11  U.S.C. § 405(g) for further consideration, consistent with this

12  decision, of Plaintiff's status as disabled, including

13  reconsidering the opinion of treating Dr. Johnson, interpreting

14  the opinion of Dr. Rios, and determining Plaintiff's residual

15  functional capacity, determining whether or not Plaintiff could

16  perform her past relevant work, and determining whether or not on

17  the basis of the Plaintiff's age, education, work experience, and

18  residual functional capacity, she could perform any work existing

19  in significant numbers within the economy, including, to the

20  extent necessary and appropriate, examination of a vocational

21  expert, and including preparation of a decision containing

22  required findings; and

23      3. Judgment BE ENTERED for Plaintiff Cynthia Rocha and

24  against Defendant Michael J. Astrue.

25  IT IS SO ORDERED.

26  **Dated:    October 6, 2008**                    **/s/ Sandra M. Snyder**
                                    UNITED STATES MAGISTRATE JUDGE

27

28